# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ROXANNE KHAZARIAN,** | : | **CIVIL NO. PENDING** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GERALD METALS, LLC,** | : | |
| | : | |
| **Defendant.** | : | **October 25, 2016** |

## COMPLAINT

## I.  PRELIMINARY STATEMENT

1.      This is an action to redress age and sex discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621 et. seq. and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et. seq., and age and sex discrimination and retaliation under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-51 et. seq.  The action also includes claims under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et. seq. and a pendant Connecticut claim for violating the Connecticut Act Concerning Pay Equity and Fairness, Conn. Gen. Stat. § 31-40z.

2.      Plaintiff requests a trial by jury on all issues triable to a jury.

## II.  JURISDICTION

3.      Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1332.

4.      Supplemental jurisdiction exists over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

## III.   **VENUE**

5.      Pursuant to 28 U.S.C. § 1391(b)(1) and (2), venue is proper within this District because Defendant, Gerald Metals, LLC, is located in Stamford, CT, and the conduct underlying Plaintiff's claims occurred in Connecticut.

## IV.   **EXHAUSTION OF REMEDIES**

6.      Plaintiff timely filed her initial claims with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on or about January 25, 2016.  Plaintiff received a Release of Jurisdiction ("ROJ") from the CHRO on July 29, 2016 and a Notice of Right to Sue ("NORTS") from the EEOC on October 18, 2016.  She has filed these claims within 90 days of her receipt of the ROJ and NORTS, respectively.

7.      Plaintiff timely filed a second set of claims on or about May 30, 2016 alleging that she had been retaliated against because she opposed the Defendant's discriminatory action under the ADEA, Title VII and the CFEPA.  More than 60 days have elapsed since she filed her ADEA retaliation claim.

## V.   **PARTIES**

8.      The Plaintiff, Roxanne Khazarian ("Plaintiff" or "Khazarian") is an individual who resides at 585 Cutspring Road, Stratford, CT 06614.

9.      At all relevant times, she was an "employee" as defined by the ADEA, Title VII, CFEPA and the FMLA.

10.      The Plaintiff is female.

2

11.     The Plaintiff's date of birth is October 3, 1955.  She is presently 61 years of age.

12.     The Defendant, Gerald Metals, LLC ("Defendant" or "Gerald Metals, LLC") is a part of the Gerald Group, which is a global commodity trading enterprise with Gerald Holdings LLC as the top company in the Group.  Gerald Metals has a business address of 680 Washington Blvd., Stamford, CT 06901.

13.     At all relevant times, the Defendant has employed more than 20 employees and, therefore, is an "employer," as defined by the ADEA, Title VII and the CFEPA.

14.     At all relevant times, Gerald Metals employed more than 50 employees and, therefore, is an "employer," as defined by the FMLA.

## VI.     <u>FACTS</u>

15.     Khazarian received her Bachelor of Arts degree, Summa Cum Laude and Phi Beta Kappa, from Yale University in 1977 and her Juris Doctorate Degree from the University of Pennsylvania Law School in 1980.

16.     After working for 4 ½ years as an Associate Attorney at one of Connecticut's premier law firms, Khazarian worked as an In-House Counsel for several prominent corporations over the following 23 years, including Cadbury Schweppes, Textron Lycoming, Ethan Allan, General Electric, Kaplan and Gibson Guitars.  She served as Senior Counsel, International and Commercial, Textron Lycoming from 1988-94; Vice President, General Counsel & Secretary of Ethan Allen, Inc. from 1994-2002, Vice President, General Counsel of Kaplan from 2003-04, and Senior Vice President, General Counsel & Secretary from 2005-07 at Gibson Guitars.

17.     In August, 2006, <u>Corporate Counsel Magazine</u> published an article profiling the breadth of Khazarian's experience as an In-House Attorney.

18.     On December 4, 2007, Gerald Metals, Inc. (now Gerald Metals, LLC) extended the Plaintiff an Offer of Employment as General Counsel for The Gerald Group but only for a six-month "trial" period.

19.     After successfully completing her six-month trial period, Gerald Metals continued to employ Khazarian as its General Counsel.

20.     Khazarian was required to complete a probationary period that was twice as long as what other employees are required to complete despite the length and depth of her experience as an In-House Attorney.

21.     In 2012, Khazarian's title of General Counsel was expanded to include Anti-Corruption Compliance Officer.  However, her compensation was not increased despite the expansion of her role.  Upon information and belief, Gerald Metals increased the compensation of younger and/or male employees when their roles were expanded.

22.     Female attorneys, generally, and female attorneys in senior-level positions, specifically, working as "In-House" lawyers within corporations are generally paid significantly less than male attorneys in these positions.

23.     According to one survey conducted in 2013 by American Lawyer Media ("ALM") Legal Intelligence, male General Counsels and chief Legal Officers received annual average cash compensation of $723,700, while females with the same positions received $575,700, more than 20% less.[1]  ALM's Corporate Counsel reported in 2013 that male Deputy Chief Legal Officers were annually paid $386,700; female attorneys in the same positions are paid $316,400, 18% less.[2]  According to a survey released in August, 2016 called the Acritis

---

[1] "Top In-House Lawyers Get Paid a Lot Less Than Females, Survey Says, ABA Journal, Sept. 10, 2013.
[2] Rebecca Mintzner, "Survey Finds High-Level Women In-House Lawyer Paid Less," Corporate Counsel, Sept. 9, 2013.

Research Ltd.'s 2016 Diversity Report, the male in-house lawyers were paid about 18% higher than female in-house lawyers.[3]

24.    According to a 2013 Law Department compensation Benchmarking Survey, female in-house lawyers' annual bonuses were about 40% less than their male counterparts in 2013.[4]

25.    Khazarian was paid an annual salary of $260,000 when she was hired.

26.    The annual salary of $260,000 from Gerald Metals was a substantial reduction in the salary she received in her previous position as Senior Vice-President, General Counsel of Gibson Guitars.  However, Fabio Calia, who was then Chief Operating Officer for Gerald Metals, told her that her base salary would have to be lower to fit within Gerald Metals' compensation structure but that would be offset by an annual bonus which would range from 100-150% of her base salary.

27.    After completing her six-month trial period, her annual salary was increased to $285,000 in or around September, 2008.

28.    Over the course of the remaining eight years at Gerald Metals, Khazarian only received one annual salary increase.  In or around November, 2011, her annual salary increased from $285,000 to $305,000.  It was only increased after Khazarian said she would file claims for age and sex discrimination after she found out that she was to be blamed and terminated for a project on which senior male executives had worked.

29.    The Plaintiff was employed by the Defendant from January, 2008 until she was terminated by a letter dated April 5, 2016.  The letter stated that Khazarian was terminated

---

[3] See www.corpcounsel.com (Oct. 20, 2016)
[4] Id. (citing "2013 Law Department Compensation Benchmarking Survey," which compiled compensation information from 4,851 attorneys within nine job categories within 188 corporate law departments.)

effective immediately.  The termination letter also stated that Plaintiff's compensation was to be paid through April 1, 2016

30.     The Plaintiff performed well throughout her eight-year tenure as Gerald Metals' General Counsel.

31.     On information and belief, the Defendant has engaged in widespread and systemic age discrimination against its employees, generally, and older female employees, particularly, with respect to its employment practices related to hiring, promotion, leadership opportunities, opportunities for advancement and termination.

32.     Gerald Metals' decisions are controlled by a Board of Directors who are all male.

33.     On information and belief, Gerald Metals has never had a female member on its Board of Directors.

34.     Khazarian's performance as General Counsel was repeatedly praised throughout her tenure working for the Defendant.  In fact, her supervisor, Gary Lerner, once told her that she was better than the company's expensive outside counsel from New York.

35.     The Defendant's discriminatory employment practices based on age and sex escalated after it promoted the approximately 43 year old Craig Dean as its Chief Executive Officer in January, 2013.

**CEO Dean Sets Goal of Hiring New, Younger Employees and Marginalizing Older Employees**

36.     On information and belief, soon after soon after taking over as CEO, Dean announced that he wanted to lower the average age of employees by 15 years, run the company with employees in their 30's and 40's and "marginalize" employees over 50.

6

37.     When positions at Gerald Metals became available, the Defendant did not post the position internally.  As a result, older individual employees were not given an opportunity to apply and be considered for positions and/or promotions.  On information and belief, the Defendant started to post open positions at some point after the Plaintiff filed her CHRO and EEOC complaints on January 25, 2016, stating, among other things, that Gerald Metals failed to post internally available positions.

38.     On information and belief, Gerald Metals paid newly hired employees compensation based on market rates based on their positions and titles.  However, the Defendant did not adjust compensation to market rates for more senior, older employees with years of experience with Gerald Metals, thereby perpetuating compensating older employees at levels that were below market levels for their job duties and levels of experience.

39.     On information and belief, over the past three years, the defendant has not given most older employees (defined for purposes of this Complaint as employees over 50 years of age) annual pay increases but has given annual pay increases to younger employees (defined for purposes of this Complaint as employees in their 20's, 30's and 40's).

40.     Over the past three years, older employees have been assigned titles which did not reflect the full scope of their responsibilities.

41.     On information and belief, the Defendant's Human Resources Administrator, Tina Mingachos ("Mingachos"), repeatedly asked a female employee who was over 60 years of age when she was going to retire.  (That employee eventually did retire in July, 2016.)

42.     On information and belief, in around 2014, Craig Dean repeatedly asked a 60 year old male employee when he was going to retire.

43.     On information and belief, over the past three years, the Defendant has reduced and/or refused to increase the annual bonus payments that it had made in previous years to older employees while materially increasing the annual bonus payments made to younger employees when compared to previous years.

44.     In or around July, 2015, Dean formed a task force of department managers that was intended to restructure departments and individual career paths to create a more dynamic department and implement necessary change.

45.     On information and belief, one of the ways that Gerald Metals intended to implement change and make departments more dynamic was to further marginalize older employees by, among other things, taking away substantial parts of their job duties, transferring those duties to younger employees, not providing them with annual pay increases, and paying them substantially less bonuses than paid in previous years.

46.     On information and belief, in response to Dean's instructions to implement change and restructure departments and individual employee career paths, in September, 2015, the Defendant's approximately 40 year old Manager of its North America Traffic and Distribution Department adopted a strategy plan which stated, among other things, that:

- "The department is on the mature side, in both experience and age."

- A  "Maturing Department" was one of the four issues which the Department needed to address and elaborated "The group is maturing and we can possibly see 2 to 3 key members of the group depart within the next few years."

- To help solve the "maturing department" issue, they needed to "analyze certain roles and responsibilities and determine if it fits in the Stamford office. Justification:  With a maturing group, there is an expectation of departures within

the next 2 to 3 years.  Given these expectations, it might be the right time to study if certain roles performed in Stamford can be done in other offices, merged into other people's roles in Stamford or other offices."

47.   On information and belief, in October, 2015, the Defendant began implementing its plans to restructure its departments.

48.   Within one month after the Strategy Plan for the Traffic Department was implemented, on information and belief, the Defendant held meetings with employees to discuss compensation and job responsibilities.  One of the "mature" employees in the Traffic Department was its Manager of Refined Copper Distribution, Denise Isherwood, who was 62 years of age and had been employed at Gerald Metals for 18 years.  Isherwood was told she would not be getting an annual salary increase (for the third straight year), that her annual bonus would be 50% less than it had been the previous year, that a majority of her work would be handled in the Defendant's Switzerland office (by a new employee who was approximately 35-40 years of age) and that Isherwood would need to travel to Switzerland to train the new employee.

49.   During the period between October, 2015 and February, 2016, a staff layoff in the Stamford Legal Department was implemented as part of a company-wide cost cutting measure. During the same time period, Gerald Metals hired three younger male attorneys to work in the Legal Department in the London office.  The top lawyer of these new hires was Angus Macdonald, an approximately 45 year old man who was hired into the position of General Counsel EMEA (Europe, Middle East and Africa).  Macdonald later admitted to the Plaintiff that Dean told him they were hired to take away work from the Legal Department in Stamford which reported to the Plaintiff.

50.     On information and belief, in or around September-October, 2015 Gerald Metals implemented similar restructuring plans in each of its departments and with respect to individual employee career path plans which resulted in several older employees, generally, and older female employees, particularly, being informed that they would receive little or no pay increase for the fiscal year ending April 2016, that their bonuses from the previous year would be reduced and that their job duties would be restructured in a way that would entail taking away certain job duties and reassigning them to younger employees.

51.     On information and belief, as a result of the aforesaid steps it has taken, the Defendant has succeeded in reducing the average of its employees.

52.     On information and belief, as a result of Gerald's restructuring plan over the past two  years, 11 senior-level managers -- whose average age was approximately 58 -- have either been terminated, resigned, retired and/or announced their decision to retire.

53.     The Plaintiff did not receive an annual salary increase in 2012, 2013, 2014, 2015 or 2016.

54.     On information and belief, in or around May, 2016, Gerald Metals was in the process of trying to fill at least three open financial positions.  During a telephone conversation held in an open and public area at Gerald's Stamford offices on or about May 19, 2016, Defendant's Senior Vice President of Finance and Operations, Patricia Crepeault, blurted out that she wanted to hire "young, young, younger" applicants.

**The "Good Ol' Boy" Network is Alive and Well at Gerald Metals**

55.     The commodity trading industry has long been known as a male-dominated industry.

56.     Gerald Metals held its most important company business event annually at the Playboy Club in London, England for a number of years.  The *Financial Times* magazine observed in an October 12, 2015 article that "Some traders were asking if it was wise of Gerard (sic) Metals to hold their cocktail reception at the Playboy Club in Mayfair.  While metal trading has always been something of a boys' club, most City firms have tried (at least politically) to make strides to change their dynamic over the past decade."

57.     On information and belief, there has never been a female on Gerald Metals' Board of Directors in its 50 year history.

58.     On information and belief, Gerald Metals currently employs seven practicing attorneys – all of whom are male and both much younger and much less experienced than Khazarian.

59.     On information and belief, Khazarian is the only attorney who the Defendant hired and who was first required to complete a six-month trial period.

60.     Just three days after the Plaintiff was terminated, the Defendant announced that it had promoted Angus Macdonald, who had been hired just a few weeks earlier, to Group General Counsel.  Mr. Macdonald was promoted just 60 days after joining Gerald Group.  Even though she was hired as General Counsel for the Gerald Group and during her eight-year tenure as General Counsel was the most senior attorney for the Gerald Group, Khazarian was not permitted by the Defendant to use a Group level title.

61.     In stark contrast to its treatment of female employees over 50 years of age, the Defendant provided favorable treatment to younger, attractive female employees.  For example, three female employees in the 40-50 years old age range were collectively known as "Craig's Girls."  Two of these employees were given Vice President titles.  On information and belief,

they were provided favorable treatment which was not provided to older employees, such as being provided higher salaries and bonuses than older, female employees in comparable positions, being permitted to come to work early and leave later, being permitted to use flex time and being assigned to work with the CEO on his personal matters rather than supporting Gerald Group projects.

62.     On information and belief, "Craig's Girls" were routinely invited to go to company and/or social events with Gerald Metals' male senior executives to which older female employees, including the Plaintiff, were not invited.  Plaintiff was routinely excluded from business meetings and travel on behalf of the company.

63.     On information and belief, over the past three years, most of the new employees hired and/or promoted by the Defendant have been white males under 45 years of age.

64.     On information and belief, Defendant punishes female employees more than male employees when dealing with perceived improper behavior.  For example, Khazarian was physically assaulted in or around September, 2012 in the Stamford office in front of witnesses by a male employee.  The next morning, the Defendant's Chief Operating Officer came to Khazarian's office and told her the assault was her fault because she tried to calm down the male colleague and ran away from him for her safety.  Gerald Metals spoke to the male employee to counsel him but did not take any disciplinary action against him.  The employee was neither terminated nor suspended even though Gerald Metals has a "zero tolerance" policy against workplace violence.  Similarly, when Khazarian complained in August 2013 about age and sex discrimination, she was given a written warning for being "disruptive."  In a meeting with Dean and Mingachos on February 19, 2016 when Dean warned Plaintiff as to her use of company emails, when Plaintiff brought up the fact that other senior male executives such as a Senior Vice

President were widely known to use and direct all company emails through his personal email account, Dean dismissed that activity as "different".

65.     In contrast to its treatment of male employees when dealing with disciplinary matters, when its former employee, Denise Isherwood, complained in a meeting in October, 2015 after she was told she would not receive an annual pay increase for the third year in a row, Gerald Metals gave her a written warning and threatened her with termination if it happened again.

66.     On information and belief, Gerald Group provided male senior-level employees with annual pay increases and bonuses which far exceeded the annual pay increases and bonuses given to its few female senior-level employees.

67.     In December, 2014, the Defendant's Senior Vice President of Business Development, Gary Lerner, stated that Plaintiff's title of "General Counsel" was a more senior role than that of a Vice President.  However, the males whose positions indicated the title of "Vice President" received annual compensation that was substantially higher than Plaintiff's compensation.

68.     Before joining Gerald Metals, Khazarian was told by its then-CFO, Fabio Calia, that she could expect to receive an annual bonus in the range of 100-150% of her annual salary.

69.     The Defendant's then-Controller, Robert Liberati, also confirmed to Khazarian that senior employees at her level could expect to receive annual bonuses in the range of 100-150% of her annual salary.

70.     The Plaintiff's average annual bonus during her eight year tenure at Gerald Group was approximately $44,000.  That is approximately 14.8% of her annual base salary over that same time period.

71.     On information and belief, Gerald Group's male senior-level employees have received bonuses which are at or above 100% of their annual salaries.

**Gerald Group Prohibits Its Employees From Discussing Compensation to Avoid Discovery of Its Discriminatory Pay Practices**

72.     To avoid having its employees find out about how male and/or younger employees receive much higher compensation than its female and/or older employees, Gerald Metals, among other things, prohibits its employees from discussing either their own compensation or other employees' compensation.

73.     In or around November, 2015, Denise Isherwood received a written warning because, during a meeting held in October, 2015, she discussed both her compensation and another employee's compensation.

74.     On December 7, 2015, the Defendant's Human Resources Administrator, Tina Mingachos, told Denise Isherwood not to discuss her wages or her co-worker's wages.

75.     On or about February 8, 2016, Dean told Khazarian not to discuss salary matters with anyone.

76.     In a meeting with Dean and Mingachos held on February 19, 2016, Dean told Khazarian that it was "company policy" that no one could discuss their compensation with any other employee other than their direct supervisor or Human Resources.  Khazarian was then given a warning for allegedly discussing compensation with a co-worker.

**Defendant Retaliated Against Khazarian for Opposing Its Unlawful Discrimination**

77.     Khazarian opposed Gerald Group's unlawful discrimination informally by complaining to Craig Dean, Gary Lerner and Tina Mingachos that the company's actions and compensation practices discriminated against older employees, generally, and older female

14

employees, particularly.  She also complained that she was being retaliated against for complaining about and opposing the Defendant's unlawful age and sex discrimination.

78.     Khazarian opposed the Defendant's unlawful discrimination formally by filing complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and Equal Employment Opportunity Commission ("EEOC") against Defendant on January 27, 2016, alleging age and sex discrimination as well as retaliation.

79.     At the time of filing, Khazarian was out on leave from the company.  She had gone out on leave in or about October 2015 to care for her 90 year old father who was terminally ill.  He passed away on November 10, 2015.  While caring for her father, Khazarian's own health suffered and, as of November 18, 2015, her cardiologist certified her condition as a "serious illness" as defined by the Family and Medical Leave Act ("FMLA").

80.     While on FMLA leave, the Plaintiff should have been considered on medical leave and covered under the company's salary continuation plan under which she would have been paid 70% of her salary.  However, she was forced to use the balance of her accrued vacation time and was then placed on unpaid leave from December 4, 2015 until she returned to work on February 8, 2016.

81.     The Defendant had sent Plaintiff the FMLA paperwork and a copy of the company's salary continuation plan.  Defendant did not advise Plaintiff of her right to have her medical leave covered under paid salary continuation, as required under the notice provisions of the FMLA.  Defendant did not notify Plaintiff of any eligibility for coverage, restrictions on coverage, deadlines for filing or any other conditions relating to coverage.  Upon information and belief, Defendant has provided more detailed notices to other employees who have taken leave, including, but not limited to, relating to deadlines for filing for coverage.

15

82.     While Plaintiff was on leave, in or around October or November, 2013, Gerald Metals cut Plaintiff's bonus by $30,000 from the prior year – an almost 30% reduction – and again gave her no raise.

83.     This pattern of retaliation continued before Khazarian's return to work.  Dean called Khazarian into a meeting with Mingachos on February 19, 2016 and volunteered that he considered not allowing Khazarian to return to work after she had filed a claim for age and sex discrimination with the CHRO.

84.     Defendant refused to proceed with Plaintiff's request to process her time out on medical leave for coverage under Defendant's salary continuation plan.  On or about January 25, 2016 Mingachos called Khazarian to find out if she was coming back to work.  In this call - which occurred two days before she filed her CHRO and EEOC complaints on January 27, 2016 – Khazarian asked if she would be eligible to get credit back for leave time which had been deducted from paid vacation time and/or get paid at or about 70% of base pay for her leave time which had been unpaid after expiration of her paid vacation.  Mingachos advised that this employee benefit plan was "salary continuation" and confirmed that she could qualify for a change in such pay status and apply for such change when she returned to work.  Mingachos never mentioned any restriction on her eligibility to apply.  The time period from November 18, 2015 – her date of medical certification for leave - up to her return to work was eleven weeks and two days - reflecting approximately 21% of a calendar year.  Getting her medical leave properly recharacterized as covered by salary continuation could have resulted in a benefit of approximately $45,000.

85.     On the morning of February 10, 2016, two days after Plaintiff returned to work on the morning of February 10, 2016, she followed-up with Mingachos about salary continuation.

16

Contrary to their prior call on January 25, 2016 - two days before the filing of her CHRO and EEOC claims - Mingachos told Khazarian that she was required to have applied for salary continuation within ten days of when she went on medical leave and would not proceed with Plaintiff's request to submit her leave for salary continuation coverage.

86.     Khazarian said this was not mentioned in their call, in which Mingachos told Khazarian to submit for coverage when she returned to work, and was a deviation from prior policy and/or practice based on what Mingachos previously told her when Khazarian came back to work after being out for one week.  Mingachos at that time volunteered to Khazarian that some of her sick time could be re-characterized as salary continuation, and effected a change of some of her time out to salary continuation.  Mingachos said she would be willing to review this further with her but failed to do so.

87.     Less than one hour before a meeting between Dean, Mingachos and the Plaintiff on February 19, 2016, the company circulated a new and much more expansive electronic communications policy even though the last version of such policy had been circulated only three months earlier while Khazarian was out on medical leave.  Before Plaintiff had a chance to read the new policy, she was called into a meeting with Dean and Mingachos.  Dean confronted her and asked if she was violating the policy and, among other things, stated that it was a violation of the policy to keep a copy of a memo outlining her new job responsibilities and priorities.  Dean further accused her of violating company policies such as not talking about compensation.  Dean admitted that he was monitoring the Plaintiff.  He added that he was going to have Dan Gamez of the IT Department monitor Khazarian's Gerald Outlook email.  Over the next few weeks, Dean continued creating a "paper trail" by issuing warnings to Khazarian for

17

alleged wrongdoing but failed to provide Khazarian with details of her alleged wrongdoing despite repeated requests by Khazarian for that information.

88.     Dean sent a series of emails beginning late Friday, February 19, 2016 into the early morning hours of Saturday, February 20 and continuing throughout the weekend, accusing Plaintiff of violating what he claimed to be company policies.  He demanded she immediately respond in detail to each of his accusations.

89.     In response to Dean's litany of emails throughout the weekend of February 19-21, 2016, the Plaintiff said his emails were exacerbating her cardiac problems and raising other medical concerns (for which she had just been on FMLA leave for three months).

90.     As a result of Dean's relentless retaliation and hostility towards the Plaintiff, she needed to remain out of work on Monday, February 22, 2016, and go to two different doctor's appointments to address her medical conditions.

91.     The Plaintiff filed a written request for her personnel file on February 21, 2016. Under the Connecticut Personnel File Statute, as amended by Public Act 13-176, the Defendant had to provide her with access to her file within seven calendar days.  However, the Defendant withheld her personnel file and refused to provide her with access to it for almost five weeks.

92.     On Tuesday, February 23, 2016, after returning to work after she had been out sick the prior day, Plaintiff found her office desktop computer non-functional and learned  that her computer had been changed while she was out sick even though old computer had been functioning just fine.  Her work iPhone also was not functioning.  She contacted Defendant's IT Department to ask for help and to see if they could figure out how this situation occurred and spoke with Chris Monroe and/or Dan Volin of the Gerald IT Department.

18

93.     Before she left for London on Monday, March 7, 2016, Dean was berating Khazarian via email for not having very quickly responded to some emails which he alleged had been sent at various times starting early in the day, dated the previous Friday, March 4, 2016. Khazarian responded that her Inbox showed that there were approximately six or seven emails from Dean which were shown as all having been received at the exact same time a few minutes after 4:00 pm - at which time she had gone into a meeting.  After this meeting, she read the emails - reviewed them further over the weekend and was responding first thing on Monday morning when Dean contacted her.

94.     When she saw this, Plaintiff advised Defendant that there seemed to have been some protocol and/or monitoring implemented which led to a delay of transmission of emails to Plaintiff and an aggregation of all these emails for delivery all at once later in the day, just before the close of business hours for the week.  Plaintiff asked Dean if he wanted her to check on this problem directly with IT, but Plaintiff received no response of any kind to this request.

95.     During the meeting on February 19, 2016, Craig Dean admitted to Khazarian that he was engaging in various types of monitoring and surveillance of Khazarian.

96.     While in London, on or about March 10, 2016, shortly after noon/1:00 pm London time, Khazarian walked by the desk of a Senior Vice President of Defendant and saw that a page on the Stingray cell phone surveillance tracking was up on his computer.  The employee told her that he was researching Stingray cell phone surveillance tracking for Craig Dean for use on special projects.

97.     Khazarian flew out on Friday, March 11, 2016, for her return trip and arrived home after midnight on Saturday, March 12, 2016.  As an early Saturday morning call was scheduled for work, sometime before 8:00 a.m. she turned on her home computers early in the

morning but both of her computers froze up and were not functional for hours.  The Plaintiff

worked with tech support from Yahoo, Apple, and Verizon and others and was told that her

entire home network had been hacked recently - with phone calls being listened in on and her

personal password-protected emails and entire home network accessed and compromised.

Surveillance appeared to be the interest of the hack as there have been no instances of credit or

identity fraud or theft.

98.     In an attempt to further humiliate and intimidate Khazarian, Dean engaged in acts

of inappropriate and physically offensive and threatening behavior at a business dinner at the

home of a Gerald Director - Guouling Zhou - on Tuesday night, March 22, 2016 outside of

Shanghai in front of a number of guests.  At this dinner Dean loudly yelled at Plaintiff several

times to have a drink of alcohol – even though he knew she did not drink alcohol due to religious

reasons.  This was not the first time he had engaged in such inappropriate behavior.  During a

trip to London earlier in March, 2016, Dean prodded Khazarian to take a drink even after she

told him she did not drink alcohol.  Another Gerald employee who also does not drink alcohol

was present at the dinner at Zhou's on March 22, 2016 and was present at the dinner on March 9,

2016, and yet Dean did not engage in such behavior towards her.

99.     At the dinner on March 22, 2016, while Plaintiff was standing next to another

Gerald Metals attorney, Dean came right up next to her and yelled several times if he could stand

next to her.  To avoid any potential claim by Dean that she was being insubordinate, each time

Plaintiff responded, "do what you want."  Dean then brushed up against her physically rubbing

the side of his body against Plaintiff in a vertical motion and stating very loudly "should we have

a pre-nuptial agreement?"  The Plaintiff became upset, moved away from him and asked him to

stop his behavior.  This occurred shortly after Dean yelled, "I shaved my ass tonight" during the same dinner to no one in particular.

100.    Dean spent more time emailing, managing and monitoring Khazarian's activities in the six weeks after her return to work after the filing of her claim of age and sex discrimination than he spent communicating with her in the prior eight years that she was employed by Gerald Metals as its General Counsel.

101.    Khazarian returned to the Stamford office on Thursday, March 24, after a trip to Shanghai.  It was the last work day before the Easter holiday weekend.  Shortly before 5:00 p.m. that day Mingachos emailed Plaintiff that a copy of her personnel file was available for review. Under Connecticut's Personnel File Statute, Public Act 13-176, Gerald Metals was required to provide Khazarian with either access to her personnel file or with copies of the documents contained in her personnel file within seven business days of her request, which should have been on or about March 1, 2016.

102.    On information and belief, despite numerous requests by Plaintiff, Gerald Metals delayed providing Khazarian with access for 23 days after it was required to so that she would not have access to her personnel file before it implemented the disciplinary action it planned to impose against her.

103.    On March 26, 2016 - at 8:43 pm on Saturday of the Easter holiday weekend - Dean sent Plaintiff a note only to her work email placing her on administrative leave.  Like earlier warnings and reprimands from Defendant, the email dated March 26, 2016 provided no detail as to alleged activity by Khazarian which led to her being placed on administrative leave. Dean knew Khazarian's personal email address, home telephone number and cell phone number

but did not communicate the information that she had been placed on administrative leave by either telephone or her personal email.

104.    The March 26, 2016 notice placing her on administrative leave stated that Dean had information that Khazarian had been retaining copies of documents and working on her "personal court case" during work hours.  The letter did not provide any details or documents supporting that conclusion.  The notice stated that the Plaintiff was scheduled to meet with Dean on April 4, 2016 but until then she was placed on paid administrative leave and her access to the Gerald network and Defendant's offices would be cutoff immediately.

105.    Khazarian did not see the March 26 email from Dean until she arrived at work on Monday morning, March 28, 2016.  Khazarian was escorted out of the office a short time after her arrival in full view of her co-workers by Mingachos.

106.     The email placing Khazarian on leave appeared less than approximately 40 minutes after a suspicious email appeared as having been received in her personal email accounts late on Saturday night, March 25, on Easter weekend (as more fully described hereafter).  The Plaintiff did not read this suspicious email until Monday morning - March 28, 2016 - and intended to report this to Defendant for investigation.

107.    The content of the aforesaid suspicious March 26, 2016 email made it appear as if the sender was someone whom Plaintiff knew, who knew her work schedule and with whom she had met with during her business trip to London and indicated that the Plaintiff allegedly was to provide company documents to the sender and/or was soliciting her to do the same.  In addition, the sender attached two separate Gerald Metals company documents – documents which would have been accessible only to Gerald employees, representatives and/or a person or entity who would have hacked into accounts maintained by such personnel and/or the Gerald systems.  One

22

of the two documents was the same document retention of which Dean warned Khazarian was a violation of the company electronic communications policy.  On March 30, 2016 Plaintiff informed Dan Volin and Dan Gamez of Defendant's IT Department Helpdesk of this email.  She explained that everything about the email as it related to her was false, that she had no knowledge as to sender and had never engaged in the alleged activity.  As the sender had access to specific Gerald Metals information - such as company documents and Khazarian's recent travel schedule -  and in light of also learning that her personal accounts and devices had been hacked - she reported this incident to Gerald Metals to help determine if the company network was hacked and, if so, the extent of the hack.  Plaintiff followed up on April 1, 2016 via email to Volin and Gamez with the IP address information for the suspicious email to assist the company in any investigation. Each time Plaintiff provided a copy of her communication with Volin and Gomez to Dean and Mingachos.  Plaintiff never received any response from the Company.

108.    On information and belief, Gerald Metals never conducted any investigation into either the suspicious March 26 email or the hacking of Khazarian's email account.

109.    On March 30, 2016, while at home on leave Khazarian received a copy of her personnel file sent by the Defendant.  However, the Defendant withheld all documents in her personnel file dated on or after February 21, 2016.

110.    On April 1, 2016 the Plaintiff sent a letter to Defendant addressed to Dean and Mingachos by hand delivery and email that same day stating that she would not meet with Dean personally on April 5 and was concerned for her physical well-being in his presence.  In her letter dated April 1, 2016, Plaintiff stated that, due to the continued pattern of unlawful discrimination, harassment, retaliation, and surveillance, Gerald's actions constituted

constructive discharge.  The Plaintiff advised that as a result of such constructive discharge, she was forced to resign as of April 1, 2016.

111.    Dean did not accept Khazarian's resignation letter and instead issued a termination letter dated April 5, 2016 which was delivered to Plaintiff via overnight delivery on April 6, 2016.  The termination letter stated that he previously had decided to "terminate your employment, which I had intended to do in person at our meeting."  The termination letter stated that Khazarian (i) manipulated an employee (ii) used her work computer to gather evidence for her claims (iii) misappropriated and sent Gerald Metals documents to various personal email accounts and (iv) maintained photographs of employees in violation of their privacy rights.  The termination letter failed to provide any details or documents to support any of these accusations.

112.    Khazarian filed a second request under the Connecticut Personnel Files Act to obtain copies of the documents from her personnel file dated on or after February 21, 2016 which the Defendant had failed to produce.  However, once again Gerald Metals failed to provide further details or documents supporting its allegations made in her termination letter or earlier warnings.

113.    Defendant has refused to respond to Khazarian's repeated requests as to what other surveillance or monitoring of her has been undertaken.

114.    In its letter dated April 5, 2016 terminating her employment, Defendant admitted having information as to information in her personal email accounts and/or photos of employees. Her personal email accounts are password protected.  She keeps photographs on her personal devices.

115.    The Defendant's articulated reasons for terminating the Plaintiff's employment were pretextual.

116.     Gerald Metals further retaliated against the Plaintiff by failing to provide her with information related to applying for unemployment benefits with the Connecticut Department of Labor, failed to pay her wages and benefits up through the April 6, 2016 date of termination and failed to maintain insurance coverage through the date of her termination.

**Gerald Unilaterally and Without Notice Repurchased and Cancelled Khazarian's MTC Stock Grant to Retaliate Against Her Because She Filed Claims With the CHRO and EEOC**

117.     As part of her compensation in 2013, Khazarian received a grant of stock in Metals Trading Corp. ("MTC") which is the shareholder entity which owns the shares of Gerald Holdings as the top company in The Gerald Group.

118.     Craig Dean is the CEO, President and Director of MTC, Gerald Holdings and Gerald Metals.

119.     Gary Lerner is the General Counsel and Company Secretary of MTC and Company Secretary of Gerald Holdings and Gerald Metals.  All of these entities are Delaware domestic companies. Gary Lerner also was Khazarian's direct supervisor at Gerald Metals.

120.     By way of a letter dated n July 18, 2016 to MTC, Khazarian exercised her right as an MTC shareholder under Delaware law and demanded an inspection of MTC books and records.

121.     MTC responded by way of a certified letter dated July 29, 2016 from Gary Lerner to Plaintiff (the "MTC Stock Response"), which was postmarked August 3, 2016 and received by Plaintiff on August 6, 2016. The MTC Stock Response stated that (i) her shares had been repurchased and cancelled by MTC on April 1, 2016 and, therefore, she was no longer a

shareholder (ii) and that this action was taken in accordance with the provisions of a shareholder agreement, an equity incentive plan and other referenced documents.

122.    The Plaintiff was never provided any notice that her MTC stock had been repurchased and cancelled, whether as of April 1, 2016 or any other date, and did not discover this until she received the MTC Stock Response more than four months later.

123.    Khazarian had never been provided with a copy of the MTC Shareholder Agreement or other documents referred to in the MTC Stock Response.

124.    Plaintiff has subsequently requested a copy of MTC's Stockholder Agreement as well as related documents.  However, MTC has refused to provide any information other than resending another copy of the MTC Stock Response.

125.    On information and belief, other Gerald Metals' employees who have received grants of stock in MTC and/or other entities related to and/or under the common control of The Gerald Group and/or its ownership have been permitted to retain ownership of and/or receive a payout of their stock in less than five years.

126.    As a result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, substantial loss of wages and benefits.

127.    As a result of the Defendant's discriminatory actions set forth above, the Plaintiff has suffered and continues to suffer, severe emotional trauma, including, but not limited to, severe anxiety, sleeplessness, breathing difficulties, crying spells, cardiac problems, shortness of breath and visual problems.

## VII.   CAUSES OF ACTION

**COUNT ONE:  ADEA:  AGE DISCRIMINATION**

128.     Paragraphs 1-127 of this Complaint are re-alleged as Paragraphs 1-127 of the First Count.

129.     Plaintiff's age was a motivating factor in Defendant's employment actions set forth above with respect to compensation, treatment and other terms and conditions of employment.

130.     Defendant's discrimination against Plaintiff on account of her age in suppression was willful.

131.     As a result of these unlawful actions of Defendant, Plaintiff has suffered and will continue to suffer economic damages and severe emotional trauma.

**COUNT TWO:  TITLE VII:  SEX DISCRIMINATION**

132.     Paragraphs 1-131 of this Complaint are re-alleged herein as Paragraphs 1-131 of this Second Count.

133.     Plaintiff's sex was a motivating factor in Defendant's employment actions set forth above with respect to compensation, treatment and other terms and conditions of employment.

134.     As a result of these unlawful actions of Defendant, Plaintiff has suffered and will continue to suffer economic damages and severe emotional trauma.

**COUNT THREE:  CFEPA – AGE DISCRIMINATION**

135.     Paragraphs 1-134 of this complaint are re-alleged as Paragraphs 1-134 of this Third Count.

136.    Plaintiff's age was a motivating factor with respect to the Defendant's action set forth above related to the Plaintiff's compensation, treatment and other terms and conditions of employment.

137.    As a result of these unlawful actions of Defendant, Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT FOUR:  CFEPA – SEX DISCRIMINATION**

138.    Paragraphs 1-137 of this Complaint are re-alleged herein as Paragraphs 1-137 of this Fourth Count.

139.    Sex was a motivating factor which led to the Defendant's employment actions set forth above with respect to compensation, treatment and other terms and conditions of employment.

140.    As a result of these unlawful actions of Defendant, Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT FIVE:  ADEA – RETALIATION**

141.    Paragraphs 1-140 of this Complaint are re-alleged herein as Paragraphs 1-140 of this Fifth Count.

142.    The Defendant retaliated against the Plaintiff for opposing its unlawful employment discrimination by, among other things, subjecting her to abusive treatment, subjecting her to unlawful surveillance, falsely accusing her of wrongful activity and terminating her employment for pretextual reasons.

143.    As a result of the Defendant's unlawful retaliation, Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT SIX:  FMLA – INTERFERENCE**

144.    Paragraphs 1-143 of this Complaint are re-alleged herein as Paragraphs 1-143 of this Sixth Count.

145.    The Defendant interfered with the Plaintiff's rights under FMLA by engaging in the conduct set forth in the aforesaid paragraph 80, 81, 85 and 86.

146.    The Defendant willfully violated the FMLA.

147.    As a result of the Defendant's unlawful interference in violation of the FMLA, the Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT SEVEN:  FMLA RETALIATION**

148.    Paragraphs 1-147 of this Complaint are re-alleged herein as Paragraphs 1-147 of the Seventh Count.

149.    The Defendant retaliated against the Plaintiff because she exercised her right to take FMLA leave.

150.    The Defendant willfully violated the FMLA.

151.    As a result of the Defendant's violation of the FMLA, the Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT EIGHT:  AN ACT CONCERNING PAY EQUITY AND FAIRNESS, CONN. GEN. STAT. § 31-40z**

152.    Paragraphs 1-151 are hereby incorporated as Paragraphs 1-151 of this Ninth Count.

153.    The Defendant prohibits its employees from discussing their compensation or other employees' compensation.

154.    The Defendant disciplined and discriminated against the Plaintiff because she discussed her compensation.

155.    The Defendant maintains a Pay Secrecy Policy even though the Connecticut Legislature passed an "Act Concerning Pay Equity and Fairness," Public Act 15-196 on July 1, 2015 prohibiting such actions.

156.    The Defendant's actions violated the Connecticut Pay Equity and Fairness Statute.

## VIII.   <u>PRAYER FOR RELIEF</u>

Wherefore, the Plaintiff respectfully prays that this Court take jurisdiction over this case and grant judgment against the Defendant.  Plaintiff prays that the following relief be awarded:

1.  The economic losses, including lost wages, benefits and stock that she has suffered as a result of Defendant's conduct;

2.  Pre-judgment and post-judgment interest on her economic losses;

3.  Reasonable attorneys' fees and costs;

4.  Liquidated damages in the form of a doubling of any economic losses that she has suffered as a result of Defendant's conduct in violation of the ADEA;

5.  An award of compensatory damages for loss of reputation, emotional distress, humiliation, pain and suffering;

6.  Punitive damages;

7.  Any and all other legal or equitable relief, including, but not limited to, punitive damages, that may be appropriate to the law and circumstances of the case and evidence.

Done at Stratford, Connecticut, October 25, 2016.

THE PLAINTIFF

By: /s/ Gary Phelan_____
Gary Phelan, (ct03670)
Maria E. Garcia-Quintner (ct27568)
Mitchell & Sheahan, P.C.
80 Ferry Blvd., Suite 216
Stratford, CT 06615
(203) 873-0240 phone
(203) 873-0235 fax
*Counsel for Roxanne Khazarian*